SHERYLYN H. HILL *et al.*, Plaintiffs-Appellants and Counterdefendants and Cross-Appellees, v. NAMES AND ADDRESSES, INC., Defendant-Appellee and Counterplaintiff and Cross-Appellant.

First District (2nd Division)   No. 1—88—3235

Opinion filed April 23, 1991.

Morton Denlow, of Dardick & Denlow, of Chicago, for appellants Sherylyn H. Hill and Greenfield Direct Response, Inc.

Daniel S. Mathless, of Law Office of Daniel S. Mathless, of Chicago, for appellee Names & Addresses, Inc.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff Sherylyn H. Hill sought a declaratory judgment in circuit court that certain portions of an employment agreement between her and her former employer, defendant Names & Addresses, Inc. (NAI), were unenforceable. She also sought the payment of commissions which she alleged were owed to her by NAI.

NAI counterclaimed that Hill had breached a covenant contained in the agreement that she would not, for two years following termination of her employment, sell any service or product similar to those sold by NAI to anyone who was its customer during her employment.

NAI also claimed that Hill's new employer, counterdefendant Greenfield Direct Response, Inc. (GDR), wrongfully interfered with the contractual relationship that had existed between Hill and NAI. NAI further charged Hill with breaching her duty of loyalty to it, and

with violating the Uniform Deceptive Trade Practices Act (Ill. Rev. Stat. 1985, ch. 121½, par. 311 *et seq.*) (Trade Practices Act) and the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1985, ch. 121½, par. 261 *et seq.*) (Consumer Fraud Act). Finally, NAI complained that GDR conspired with and assisted Hill in these acts.

NAI sought (1) to enjoin Hill and GDR from servicing clients improperly obtained by them from NAI; (2) damages for lost profits caused by Hill and GDR and for recovery of compensation paid by NAI to Hill during the period in which she was breaching her duty of loyalty; (3) a constructive trust for profits wrongfully earned by GDR and for commissions paid by GDR to and unjustly withheld by Hill; and (4) punitive damages, attorney fees and costs of suit.

Following cross-motions for partial summary judgment and a bench trial on the remaining issues, both sides were granted partial relief. Both sides appeal from those portions of the court's judgments adverse to them.

NAI and GDR are competing companies which rent mailing lists from such entities as utilities, periodicals, trade associations, etc., and provide the lists to its customers, who use them for direct mail marketing. Hill began work at NAI in June 1982 as an account executive and list broker, without a written contract; and in August 1984 she signed an "Employment Agreement" which contained a four-part "Covenant not to Compete" (restrictive covenant). The agreement also contained a "Severability" clause, stating:

> "[If] any portion or portions of this Agreement are deemed \*\*\* unenforceable \*\*\* by a court \*\*\* [then] such provisions may be severed from this Agreement without affecting the validity of the remaining portions \*\*\*."

Additionally, the agreement, as later amended, provided that Hill was to receive a 40% commission on "closed" or "paid" orders, *i.e.*, orders that she had generated and which had been paid for in full by the customer. Commissions were to be computed and paid every six months.

Hill resigned from NAI on September 11, 1985, and began working with GDR the next day. On September 13, 1985, NAI sent a letter to Hill, with a copy to GDR, threatening to sue both if she violated the terms of her restrictive covenant.

Hill then filed a complaint against NAI, which, after amendment and dismissal of several counts not at issue in this appeal, had two counts remaining. Count I sought a declaratory judgment that the restrictive covenant portions of her employment agreement were unenforceable because they constituted an unreasonable restraint on trade,

and because they were unconscionable and without consideration for the obligations they imposed upon her. Count III alleged that NAI had failed to pay commissions to Hill for orders she generated before she left NAI, but for which the customers had not paid NAI until after she terminated her employment.

NAI's amended counterclaim consisted of eight counts. Counts I, III and IV alleged that Hill, in conspiracy with GDR, had breached her duty of loyalty to NAI, causing customers to leave NAI and to become customers of GDR. Count II charged that Hill and GDR had engaged in deceptive trade practices as defined in sections 2(2), (8) and (12) of the Trade Practices Act (Ill. Rev. Stat. 1985, ch. 121½, pars. 312(2), (8), (12)). Count V alleged that Hill and GDR, by acting as alleged in count II, also violated section 2 of the Consumer Fraud Act (Ill. Rev. Stat. 1985, ch. 121½, par. 262). Finally, counts VI through VIII claimed that Hill had violated one of the provisions of her restrictive covenant through her dealings with certain NAI customers while she was still with the firm. NAI also charged that GDR, by assisting Hill, had wrongfully interfered with her contract with NAI and with NAI's business relationships with those customers.

NAI moved for summary judgment on count III of Hill's complaint, which had asked for an accounting of and judgment for commissions still owed by NAI to Hill; and on February 1, 1988, the circuit court held that since her right to compensation did not vest until NAI had received payment on the orders as to which she was claiming commissions, and that since Hill had breached her duty of loyalty owed to NAI, she had forfeited her claim to all commissions to which her right had not vested at the time of her misconduct; consequently, the court denied Hill all unpaid commissions in excess of $7,406.32.

Later, NAI moved for summary judgment on counts VII and VIII of its counterclaim, which alleged that Hill, assisted by GDR, had breached a particular provision of the restrictive covenant in her employment agreement; and Hill moved for summary judgment on count I of her complaint, in which she had requested a declaratory judgment that portions of the restrictive covenant, including the part upon which NAI had relied in its counterclaim, were unenforceable.

On March 21, 1988, the circuit court denied NAI's motion but granted Hill's, holding that because some parts of the covenant were invalid, and because the severability clause could not be used to truncate the unenforceable parts from the remainder of the covenant, the entire covenant was without legal effect. On April 21, 1988, the court denied NAI's "Motion for Limited Reconsideration and/or Clarifica-

tion," and *sua sponte,* dismissed counts VI through VIII of NAI's counterclaim as being predicated upon the unenforceable covenant.

A bench trial was held on July 18-21, 1988, on counts I through V of NAI's counterclaim, which were the only remaining issues in the case. The circuit court rendered final judgment on July 27, 1988, finding that Hill, assisted by GDR, breached her duty of loyalty owed to NAI by misappropriating NAI's legitimate business expectancies, causing six customers to switch their business from NAI to GDR, and resulting in gains to Hill and GDR, and losses incurred by NAI.

The court awarded NAI alternative remedies: (1) to accept the imposition of a constructive trust on gains wrongfully realized by GDR and Hill, or (2) to receive damages equal to NAI's lost profits resulting from GDR's and Hill's actions. If NAI chose the constructive trust, it would embrace all profits realized by GDR from the business of the six customers wrongfully diverted from NAI from September 1985 to July 1988—a total of $154,872.41; and it would also include commissions paid by GDR to Hill in connection with the business of those six customers from September 1985 to August 1987—a total of $126,820.52. The court also held that it would not require Hill to disgorge those commissions earned after August 1987 because they were not proximately caused by her wrongdoing, but resulted more likely from Hill's efforts to maintain the business of those six clients; the court further held that disgorgement of all commissions earned would amount to the levying of a penalty. Finally, the court held that because NAI would have paid commissions to Hill if she had not breached her duty of loyalty, by virtue of the judgment that GDR disgorge all profits resulting from its actions NAI was put in the same position as it would have been in the absence of such wrongdoing.

If NAI chose to accept damages instead of the benefits of a constructive trust, Hill and GDR would be liable, jointly and severally, for all profits lost by NAI from September 1985 to July 1988 as the result of Hill's and GDR's actions—a total of $157,976.24. In addition to the choice of remedies awarded to NAI, the court awarded it punitive damages of $10,000 against Hill and $10,000 against GDR.

The court denied NAI's requests for: a two-year injunction grounded upon Hill's breach of her duty of loyalty; relief predicated upon Hill's and GDR's alleged violation of the Trade Practices Act (Ill. Rev. Stat. 1985, ch. 121½, par. 311 *et seq.*); and relief based on Hill's and GDR's alleged violation of section 2 of the Consumer Fraud Act (Ill. Rev. Stat. 1985, ch. 121½, par. 262). On September 30, 1988, the court denied Hill's and GDR's "Motion to Reconsider, Modify and Vacate" the judgment.

Hill and GDR appeal from all rulings adverse to them. NAI cross-appeals from that portion of the judgment that denies it the benefits of a constructive trust for commissions earned by Hill from August 1987 to July 1988, and from the court's denial of its claim under the Consumer Fraud Act (Ill. Rev. Stat. 1985, ch. 121½, par. 261 *et seq.*).

■ Hill appeals first from the circuit court's partial grant of summary judgment to NAI on her request for an accounting of and judgment for unpaid commissions. As noted above, the court denied her any claim to unpaid commissions in excess of $7,406.32. She asserts that there is a genuine issue of material fact as to whether she improperly collaborated with GDR while still employed by NAI and thus violated her duty of loyalty to NAI. Section 2—1005(c) of our Civil Practice Law (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c)) empowers a court to render summary judgment when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "In determining the existence of a genuine issue of material fact, courts *** must construe *** [the evidence before them] strictly against the movant and liberally in favor of the opponent." *Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.

■ Here, however, NAI relies exclusively upon Hill's own deposition testimony in which she admitted that, after having accepted an offer of employment from GDR, but before announcing her resignation from NAI, she actively collaborated with GDR in its competition with NAI. Hill received an offer of employment from GDR on August 26, 1985, and accepted it sometime before September 1, 1985. She did not announce her resignation from NAI, however, until September 11, 1985, and went to work for GDR the following day. In early September 1985, before her resignation from NAI, Hill visited Mary Stewart, who was her contact with one of NAI's clients, Banner Life Insurance Company (Banner), and during that visit, she told Stewart that she would possibly be leaving NAI. When Stewart indicated that Banner would consider doing future business with GDR rather than with NAI, Hill, at Stewart's request, showed Gil Greenfield, GDR's president, Banner's "client history report," which Hill generated through the use of NAI's computers and which she had removed from NAI's offices after business hours. The client history report summarized facts about each order placed with NAI by Banner. Other than an updated copy which Banner periodically received, there were no other copies of this report, although it could still be generated from NAI's computer. Hill left the report with Greenfield, but never notified any-

one at NAI of her actions, believing that such persons would be "displeased" thereby. She testified that prior to this act she had never before shown any of NAI's client material to a competitor.

Hill testified that she gave the report to Greenfield in order that the information it contained could be placed on GDR's computer, and that she began using the report to perform initial services for Banner on September 16, 1985. According to Hill, the client history report facilitated GDR's ability to accept and process Banner's orders once Banner switched its business from NAI to GDR. Hill, however, having had second thoughts about her actions, asked Greenfield to delete the information from GDR's computer shortly after she began to work there. She then sent a copy of the report not to NAI, whence she had taken it, but to Banner; and then, on September 18, 1985, she wrote to Stewart and asked her for an identical copy of the report. Stewart then sent Banner's copy of the report back to Hill, and the information was reentered onto GDR's computer.

In addition to her activities with Banner's client history report, Hill also removed a computer disk and copies of reports contained on that disk from NAI's premises on the night before or on the day she left NAI's employment. Hill testified that she spent significant time preparing the reports contained on the disk and that they were important to her as an NAI employee in servicing Banner. NAI had no copy of the reports in its computer system or on file; the disk and the copies of the reports that Hill removed were NAI's sole source of the information on those reports. After leaving NAI's employ and starting work at GDR, Hill mailed the computer disk and the accompanying reports to Stewart, who then mailed them back to Hill at GDR.

Having testified to the foregoing facts in her deposition, Hill does not recant them; rather, she attempts to mitigate their effect on NAI by claiming that, unknown to her employer, she had an agreement with Stewart to return those materials to Banner upon termination of her employment with NAI. There is no evidence, however, that she had any authority to make such an agreement with Banner or any other customer. Moreover, Stewart's deposition, submitted to the circuit court by Hill, records only that Hill agreed to return to Banner certain confidential documents given to her by Stewart. Even if Hill could rightfully have removed those materials from NAI's possession or premises, many of the documents she removed were not given to her by Stewart, but were generated by Hill herself in the course of her employment with NAI. In any event, as the trial judge remarked in his memorandum of opinion, the question of "ownership of the

Banner data is an issue between Names & Addresses and Banner, and not between Hill and Banner."

Finally, Hill claims that NAI had no procedure either for designating documents as "confidential" or for protecting such documents from removal by its employees. This claim, however, is at variance with her contention that her agreement to turn over NAI's files to Banner concerning its account was consistent with NAI's policy of maintaining the confidentiality of information regarding its customers. At any rate, the "confidentiality" of the materials was not the issue; rather, as the trial court held, NAI's "superior right to possession" of those materials and their importance in maintaining its business relationship with its customers. As noted above, there is no evidence that Hill's actions were either implicitly or explicitly consented to or approved by NAI. Therefore, because the facts upon which the circuit court based its judgment were either admitted or uncontradicted, and because she presented nothing in attenuation of the effect her actions had on NAI, we hold that the circuit court did not err in holding that no genuine issue of material fact existed as to whether Hill breached her duty of loyalty to NAI, and that, as a matter of law, she had indeed violated such duty by her "gross misconduct."

Hill maintains, nevertheless, that even if she was guilty of a breach of her duty to NAI on September 1, 1985, the trial court should not have denied her claim to unpaid commissions in excess of the $7,406.32 she was awarded. She insists that she is entitled to compensation for orders she procured before September 1, 1985, but which were not paid for by the customer until after that date. NAI responds that because Hill was entitled to compensation only for "closed" orders, pursuant to their contract it was obligated to pay her commissions thereon only if those orders were paid for in full by the customer before her breach.

■■ ■ Hill does not deny that "one who breaches fiduciary duties has no entitlement to compensation during a wilful or deliberate course of conduct adverse to the principal's interests" (*ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 838); however, she advances the proposition that "[t]he agent retains compensation rightfully earned before the breach." (90 Ill. App. at 838.) But her reliance on the rule that "a party may be entitled to commissions on sales made after the termination of a contract if that party procured the sales through its activities prior to termination" (*Scheduling Corp. of America v. Massello* (1987), 151 Ill. App. 3d 565, 568), is groundless, for even though the

"procuring cause rule *** protects a salesman who is discharged prior to culmination of a sale but who has done everything necessary to effect the sale," *Massello* goes on to hold that "[t]he rule applies, however, only if the contract does not expressly provide when commissions will be paid." (151 Ill. App. 3d at 568.) Thus, the *Massello* court plainly took into consideration the contract between the salesman and his employer to determine what was required of him before he would be entitled to receive commissions on sales he procured but which were made after his resignation. 151 Ill. App. 3d at 570. See also *Technical Representatives, Inc. v. Richardson-Merrell, Inc.* (1982), 107 Ill. App. 3d 830, 833 (procuring cause rule inapplicable where a contract governs the payment of commissions); *Schackleton v. Federal Signal Corp.* (1989), 196 Ill. App. 3d 437, 444.

■ The circuit court did not hold, as Hill alleges, that Hill's breach of duty prior to the time that commissions were to be computed and paid was the basis for its decision; if that had been the case, Hill would not have been entitled to the $7,406.32 in commissions on orders which had closed before September 1, 1985, but which had not yet been paid to her by NAI. Rather, because her "right to commissions *** [was] conditioned *** on the existence of a particular situation" (*Evaskus v. Neff, Kohlbusch & Bissell, Inc.* (1963), 40 Ill. App. 2d 416 (abstract of opinion)), namely, that an order generated by Hill be paid for by the customer, the failure of that incident to eventuate before her breach of duty occurred meant that Hill, despite having procured the order, was not entitled to a commission unless and until the customer paid for the order. Similarly, in *Furth v. Inc. Publishing Corp.* (7th Cir. 1987), 823 F.2d 1178 (applying Illinois law), a salesman was held not to be entitled to commissions on advertisements he sold, but which were not run until after his termination, because his contract provided that he was entitled to payment on such advertisements only if and when they were run.

Therefore, inasmuch as the contract between Hill and NAI predicated her right to compensation upon payment by the customer for an order, we hold that the circuit court did not err in ruling that the "procuring cause rule" was inapplicable to her claim and was thus within its province in awarding NAI summary judgment on her claim for unpaid commissions in excess of $7,406.32. Accordingly, we affirm the trial court's order of February 1, 1988.

■ We note that much of Hill's and GDR's appeal from the circuit court's order of July 27, 1988, is based on disagreement, not with the court's view of the law, but rather with its factual determinations. This court, however, will not disturb a trial court's findings of fact un-

less they are against the manifest weight of the evidence. (107 Ill. 2d R. 366(b)(1)(ii).) "Even if the reviewing court disagrees with the trial court, or might have come to a different conclusion, the decision of the trial court will not be reversed if there is evidence to support it." *LaGrange Metal Products v. Pettibone Mulliken Corp.* (1982), 106 Ill. App. 3d 1046, 1052.

Hill and GDR assert that it was against the manifest weight of the evidence for the trial court to find that the material Hill sent to Banner upon her resignation was NAI's property; they claim, instead, that the material belonged to Banner. Second, they claim that it was also against the manifest weight of the evidence for the trial court to find that Hill's agreement with Stewart to keep confidential all information relative to Banner and to return to Banner all documents held by NAI concerning Banner if she left NAI's employ was made to advantage Hill at the expense of her employer. These two issues, however, underlie that of whether Hill breached her duty of loyalty to NAI, which as noted above, was correctly decided by the trial court; accordingly, having already given these issues ample consideration, they require no further discussion here. We note additionally that the trial judge, as was his prerogative, found that Hill and a former NAI partner who testified in her behalf were "not worthy of belief." The court noted inconsistent and self-serving testimony, as well as selective memory of events, in making that determination. The judge also questioned Stewart's "credibility and objectivity."

Hill and GDR also charge that the trial court's finding that her removal of the Banner material left NAI with insufficient information to compete for Banner's continued business was against the manifest weight of the evidence. Hill asserts that while NAI could still have successfully competed for Banner's business after her resignation, it chose not to do so. While evidence provided by NAI employees indicates that NAI still had important information relating to the Banner account in its computers after Hill left, and although NAI officials testified that they attempted to convince Banner officials that they could continue to service Banner after her departure, Hill admitted at trial that much of the material she removed from NAI's premises was not otherwise available to NAI, material which she admitted was important to her in servicing Banner, and which she spent a significant amount of time in preparing. The value this information had in competing for Banner's business was supplied by Hill's own testimony that the computer disk and accompanying reports which she took were not returned to Banner until September 18, 1985, six days after Hill began to work for GDR and two days after Banner had

placed its first order with GDR; and that the information on the disk was used to perform services for Banner prior to September 18, 1985. Hence, even if NAI could still have successfully serviced the account after Hill's removal of the Banner material from its premises, the evidence was clearly sufficient to support a finding that her removal of information to which NAI had no ready access served to handicap NAI's ability, and to advantage Hill's and GDR's ability, to immediately compete for Banner's business.

Hill's contention that NAI could still have competed for Banner's business, but declined the opportunity, not only ignores the effect on NAI's ability to compete created by her removal of information which she obviously found useful in immediately servicing that account herself, but it also overlooks the trial court's finding, which she does not dispute, that Stewart had already decided that Banner would avail itself of GDR's services at the time that NAI officials, in the days immediately following Hill's departure, were attempting to convince Banner that they could still effectively service its needs.

Hill and GDR next fault the trial court for allegedly not requiring, as a predicate to an award of damages, the showing of a causal connection between Hill's removal of files from NAI's premises and the switch of business by Banner and five other customers to GDR. NAI responds that because Hill had violated her duty of loyalty to NAI, Hill and GDR were obliged, but failed, to prove that the customers would have switched their business to GDR even in the absence of Hill's and GDR's wrongful acts. The trial court's memorandum opinion, however, extensively and exhaustively analyzed the various wrongful acts committed by Hill and GDR, acts which not only included the removal of NAI materials from its premises and GDR's use of those materials in servicing the Banner account, but also the solicitation of Melinda Goodwin, Hill's assistant at NAI, to join GDR. In breach of her duty of loyalty to her employer, Hill cooperated in the solicitation of Goodwin and in her resulting job interview while both were still employed by NAI, but after Hill had accepted GDR's offer. *ABC Trans National Transport v. Aeronautics Forwarders*, 90 Ill. App. 3d at 824.

Besides, during the time she was removing Banner information from NAI's premises, Hill also took the files of other customers she was alleged to have improperly induced to give their business to GDR, leaving only the files relating to customers with whom she did little business. The files she carried off contained information similar to that in the Banner file, some of which was not otherwise available to NAI. Hill kept these files at her home until NAI demanded that they

be returned. She then took the files to her new employer and sent them to the customers, along with a letter stating that after a great deal of "soul searching," she had decided to leave NAI, and that "with your benefit in mind *** I decided that all the records pertaining to your mailing programs which were in my possession [*sic*] be returned to you, rather than stay at Names & Addresses." The trial judge found that "The files contained NAI's in-house notes clearly never intended for client viewing[,]" and that "Hill's letter tells her customers that she is sending them their files so as to avoid any 'compromise or inconvenience.' " Although Hill stated in the letter that the information in the files was still available to NAI, she testified that some of it was not. Goodwin testified that the files were sent to the customers under an "arrangement" whereby they would be returned to Hill at GDR; and Greenfield, in a letter to Hill shortly after she began work with GDR, referred to a "list of customers you [Hill] brought with you." Indeed, Hill herself testified that she thought the return of the files to the customers would affect their decision to change their patronage from NAI to GDR.

The trial court noted that Stewart testified that Hill's agreement to return to Banner all account information held by NAI was the major reason that she followed Hill from NAI to GDR. This agreement and its execution were but part of the activities in which she engaged in breaching her duty of loyalty to NAI. The trial court also found specifically that the profits GDR and Hill received were "caused by their misdeeds." The judge, however, denied NAI's claim for the profits resulting from the Trend-lines, Inc., account on the ground that its change of brokers from NAI to GDR was "due to events unrelated to the wrongful conduct of [Hill and GDR]."

■■ ■ While Hill and GDR claim that the trial court's decision to award NAI the profits it lost from the time of Hill's breach to the date of trial was "excessive," given the evidence that customers may have eventually followed Hill from NAI to GDR even without her breach of duty, we note that as in *ABC Trans National Transport* (90 Ill. App. 3d at 835), the fact that Hill and GDR could have so obtained the business of Banner and NAI's other clients does not relieve them of liability for having caused their shift through improper means. Hill herself testified that the relationships between NAI and its patrons often lasted for years. Therefore, Hill's and GDR's charge that the trial court did not require proof of a causal connection between their acts and the defection of clients from NAI to GDR is unfounded, for the court not only required it, but the record is prodigious with "factual support," as the judge put it, "that Hill is not a customer ma-

chine who develops customer after customer with precision-like regularity regardless of the competition. And we have factual support that NAI is not a pushover on competing for its own customers." Moreover, the judge specifically found that "NAI cannot be faulted for not pursuing the Banner account in a more aggressive manner after Hill caused the switch to GDR. The testimony of Mary Stewart made it clear that such an effort by NAI or anyone else would have been a waste of time so long as Mary Stewart was calling the shots at Banner regarding who would do the list brokerage work in that insurance company."

■■ ■ Hill and GDR next complain that the trial court erred in awarding damages based on the profits lost by NAI as the result of Hill's and GDR's actions, rather than on the value to NAI of the files and other information Hill removed from NAI's premises. In support of their argument, they cite *Scheduling Corp. of America v. Massello* (1983), 119 Ill. App. 3d 355, 360, where an employer sought damages for wrongful conversion of its sales information by a former employee, and the court held that "[w]here *** the property converted has no market value, the proper basis for determining compensatory damages is an examination of its actual value to plaintiff." There the court placed on the plaintiff the burden of proving the value of the converted property (119 Ill. App. 3d at 359-60), but because there was "no testimony as to what the value of the sales information was or *whether the average weekly sales receipts dropped as a result of [the] *** conversion*" (emphasis added), the court held that the employer had failed to sustain its burden of proof. 119 Ill. App. 3d at 360.

In light of that holding, we read *Massello* as permitting a party to fulfill its burden of proving damages by showing a loss of profits, as NAI did in the circuit court, especially since the employer in *Massello* was suing for the value of its property rather than for the value of legitimate business expectancies improperly appropriated through the *use* of the converted property. As NAI justifiably argues, Hill's purpose in purloining its files was not because they had any value as such, but rather because they were a useful tool in diverting NAI's business opportunities; the taking of the files was a means rather than an end, and therefore, Hill's and GDR's liability was properly determined by the value of the lost business opportunities suffered by NAI, rather than by the value of the files *qua* files. Moreover, even if NAI, after Hill's and GDR's actions, still had sufficient information with which it could have competed for the customers lost to GDR, they fail to show why NAI should be required to retrieve legitimate business expectations that had been wrongfully appropriated in the

first place. Accordingly, we hold that the circuit court was not without the power to award NAI damages based on lost profits.

Hill and GDR next allege that the circuit court erred in granting NAI a constructive trust on profits made by GDR and on commissions earned by Hill as an alternative to the award of damages for NAI's lost profits. They contend that because the court's judgment for damages based on lost profits to NAI was adequate, it was not entitled to an equitable remedy as an option. NAI responds that the award of lost profits was inadequate both because the amount awarded to NAI through the imposition of the trust represented greater relief and because failure to grant NAI the trust would allow Hill and GDR to keep profits wrongfully earned. The court's decision to allow NAI to *choose* between an award of damages or the benefit of a trust is not challenged. See *Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 366 (to avoid double recovery for plaintiff, a judgment may be entered in the alternative so that plaintiff recovers only one satisfaction); *Finke v. Woodard* (1984), 122 Ill. App. 3d 911, 919 (such an award may include both legal and equitable remedies).

■■■ ■ Hill and GDR correctly contend that when a plaintiff's legal remedy is adequate, the imposition of a constructive trust is erroneous. (*Hagshenas v. Gaylord* (1990), 199 Ill. App. 3d 60, 78 (constructive trust on profits earned from plaintiff corporation's former customers by disloyal fiduciary denied when plaintiff was adequately compensated by legal damages for reduction in its value).) The authorities define an adequate remedy at law as "one which is clear, complete and as practical and efficient to the ends of justice and its prompt administration as the equitable remedy." (*Cross Wood Products, Inc. v. Suter* (1981), 97 Ill. App. 3d 282, 286.) In *Cross Wood Products*, the court upheld an injunction against a former salesman who started a competing business while he was employed by the plaintiff company without its knowledge and solicited several of its employer's customers. The injured employer not only lost profits as the result of the employee's actions, but also lost its competitive position, an injury the court determined could not be adequately measured and thus could not be adequately compensated by the award for lost profits. (97 Ill. App. 3d at 286. See also *La Salle National Bank v. Refrigerated Transport Co.* (1987), 165 Ill. App. 3d 899, 900.) Moreover, "the fact that a remedy at law is available does not oust an equity court of jurisdiction. The question to be determined is whether the remedy at law compares favorably with the remedy afforded by the equity court." *Johnson v. North American Life & Casualty Co.*

(1968), 100 Ill. App. 2d 212, 218 (suit to impress a constructive trust upon the proceeds of a life insurance policy).

In the instant case the trial court awarded damages to NAI only for profits lost as the result of Hill's and GDR's diversion of the Banner account. The constructive trust was placed on profits made by GDR and Hill as the result of their diversion of Banner and five other customers. The court held that since the award for lost profits, which was calculated on the basis of NAI's profits from Banner's business in the early months of 1985, failed to reflect adequately the full extent to which Banner's use of a list broker's services was increasing, it would be appropriate, in granting relief, to take into consideration that NAI would have made greater profits from Banner had Hill and GDR not misappropriated NAI's legitimate business expectancy from that source. The court further found that the value to NAI of the business from the other five customers was also increasing at the time of Hill's and GDR's wrongdoing.

A constructive trust may be imposed even when it more than compensates the plaintiff for injury or damage resulting from a breach of loyalty by an employee, because the right to recover from one who exploits his fiduciary position for his personal benefit is triggered by the gain to the agent rather than by the loss to the principal. (*City of Chicago ex rel. Cohen v. Keane* (1976), 64 Ill. 2d 559, 565-66.) The imposition of a constructive trust in such circumstances reflects an implementation of the "wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation." (*Graham v. Mimms* (1982), 111 Ill. App. 3d 751, 762-63.) Here, the trial judge was cognizant of the need to apply this public policy when he commented, in his memorandum of opinion, that only "a total disgorgement" of profits "would recognize the seriousness of the wrongdoing" in this case. In short, "[a] plaintiff may be awarded a constructive trust whenever facts are shown in which a person holding legal title to the property at issue cannot retain the beneficial interest therein without violating some established principle of equity." (*Chicago Park District v. Kenroy, Inc.* (1982), 107 Ill. App. 3d 222, 224; *Village of Wheeling v. Stavros* (1980), 89 Ill. App. 3d 450.) In this case, there was sufficient evidence for the trial court to find inadequate an award of damages based on lost profits when such an award would still have enabled Hill and GDR to profit from Hill's breach, aided by GDR, of her duty of loyalty to NAI. We therefore find no error in the alternate award of a constructive trust on the wrongfully obtained profits of Hill and GDR.

The next issue raised by GDR is that the circuit court erred in calculating the amount of profit GDR earned from its misappropriation of NAI's legitimate expectation of business from the latter's six customers. The court's error is said to have consisted of excluding the testimony of GDR's expert witness, Raymond Bass, whom GDR put forth to testify as to how its profits should be ascertained. It further alleges that the court's finding that GDR sustained no costs deductible from its profits other than Hill's commissions was against the manifest weight of the evidence. NAI responds that because it showed sufficient proof of GDR's gains from its wrongdoing, the trial court was entitled to disregard Bass' testimony. NAI further contends that only those GDR expenses which increased as a result of its appropriation of NAI's business expectancies should be deducted from the revenues derived from those customers in determining its profit.

The court refused to admit testimony by Bass through which GDR would have attempted to show that it should be allowed to deduct from the profits it received from the business diverted from NAI the "overhead" costs of maintaining Hill as a broker. Some of those costs were entirely attributable to Hill, while others were incurred in order to maintain Hill's and GDR's other brokers. These latter costs were sought to be apportioned by GDR among its brokers on the basis that Hill, being one-fourth, and later one-fifth, of GDR's brokers was "allocated" the same proportions of those overhead costs during the periods relevant to this matter.

Because Hill and GDR were held to be constructive trustees on the profits they made from their usurpation of NAI's business expectancies, they had the burden of showing what costs were to be deducted from that trust (*Graham v. Mimms*, 111 Ill. App. 3d at 766-67; *Sheldon v. Metro-Goldwyn Pictures Corp.* (2d Cir. 1939), 106 F.2d 45, 48, *aff'd*, (1940), 309 U.S. 390, 84 L. Ed. 2d 825, 60 S. Ct. 681); and "where operating expenses are fixed, gross profits may properly be considered in assessing damages." (*Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 148.) We hold that the trial court was correct in refusing to deduct from the constructive trust GDR's overhead expenses associated with maintaining Hill as a broker. The profits wrongfully made by GDR were not categorically those earned from Hill's employment as a broker, but those earned from the six customers whose business was wrongfully preempted from NAI. While the profits for which GDR was liable were net rather than gross (*Getschow v. Commonwealth Edison Co.* (1982), 111 Ill. App. 3d 522, 534), the costs to be deducted from gross profits were those expenses incurred for the purpose of servicing the six diverted cus-

tomers. Net profits are to be determined by reducing the gross revenues generated from the wrongfully obtained business by "those cost-of-sale items and other expenses which the court concludes were not fixed." (*Klucznik v. Nikitopoulos* (1987), 152 Ill. App. 3d 323, 330; *S.A. Maxwell Co. v. DeSoto, Inc.* (1979), 73 Ill. App. 3d 844, 850.) "[T]he assessment of damages by a trial court sitting without a jury will not be set aside unless it is manifestly erroneous." *The Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 311. See also *Getschow v. Commonwealth Edison Co.* (1982), 111 Ill. App. 3d 522, 532.

■■ ■ A trial court, moreover, is not compelled to adopt the estimates of expert witnesses on damages. (*ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 834.) In the instant case, while Bass' proposed testimony may have provided a means by which the court could have determined how GDR's overhead expenses varied with the addition of Hill as a list broker, it was not useful to the court without evidence of the extent to which those expenses were incurred in her servicing of the six customers diverted from NAI, given that Hill serviced customers other than those she wrongfully diverted and that she was engaged also in attracting new clients to GDR. The only costs GDR was able to ascribe satisfactorily to the servicing of the six customers were the commissions paid to Hill as a result of her sales to them, and these costs were properly deducted. We therefore hold that the trial court's refusal to admit Bass' testimony was not an abuse of its discretion, and that its further refusal to deduct "overhead" expenses associated with GDR's employment of Hill was not against the manifest weight of the evidence, there being no evidence of which costs were incurred in sales to the six diverted customers.

Hill's and GDR's next claim is that the trial court erred in awarding to NAI a constructive trust on the commissions paid by GDR to Hill during the two years following her breach of duty on sales to the six customers whose business she appropriated from NAI. They maintain that had NAI not lost the business of those customers, NAI would have had to pay those commissions either to Hill or to another broker, and thus would not have profited to that extent. They further contend that Hill was entitled to reasonable compensation for her efforts in maintaining and developing the misappropriated business opportunities. NAI responds that all profits gained by Hill from the usurped opportunities were subject to the imposition of a constructive trust even if such monies would not otherwise have been earned by NAI unless Hill could show that the profits were earned through efforts independent of her wrongdoing. As a result, NAI cross-appeals

on the ground that Hill should have been made a constructive trustee of profits made from the services she rendered to the six customers for the entire 34-month period extending from the time of her breach of duty to the time of trial.

As noted above in our discussion of the trial court's impressing a constructive trust on GDR's profits, the purpose of such a device is not to compensate the injured party for his losses, but to deprive the wrongdoer of the gains resulting from a breach of duty. (*City of Chicago ex rel. Cohen*, 64 Ill. 2d at 565-66; *Graham*, 111 Ill. App. 3d at 762-63.) The trial court found that Hill's commissions from sales to the six customers whose business she deflected to GDR from NAI would not have been earned by her but for her breach of loyalty. After the judge deducted from those commissions the expenses she personally incurred in servicing the six customers (*Klucznik*, 152 Ill. App. 3d at 330), he held her to be a constructive trustee on the remaining funds. Noting, however, evidence of Hill's customers' satisfaction with her performance, the court also held that the commissions she was paid on her sales to those customers more than two years after her wrongdoing were not earned as the result of her breach of loyalty, but were due, rather, to her independent efforts to maintain her clients' satisfaction with her services. We are persuaded that there is sufficient evidence in the record to uphold the trial court's determination in both respects.

Hill's and GDR's next contention is that the trial court abused its discretion in awarding $20,000 in punitive damages to NAI; $10,000 from each counterdefendant. We find, however, that the evidence was profusive that Hill and GDR acted intentionally and without just cause, thus giving rise to liability for punitive damages. (*Smith-Shrader Co. v. Smith* (1985), 136 Ill. App. 3d 571, 580.) Hill's secret preemption of NAI files and other data, her active participation in recruiting Goodwin for GDR, and her providing GDR with NAI's Banner materials while still employed by NAI, for example, sufficiently demonstrate her and GDR's intent to deprive NAI of as much business as they thought they could later retain, so as to sustain an award of punitive damages.

Finally, Hill and GDR invoke the "clean hands" doctrine in asserting that NAI's counterclaim should have been barred by the trial court, specifically, because of its attempt to require Hill's compliance with the unenforceable restrictive covenant. We are satisfied, however, that because NAI's attempt to enforce the covenant was not a factor in Hill's misappropriation of NAI records and their transfer to GDR, nor in her collaboration in causing Goodwin to leave NAI,

nor in her efforts to use her position and access to NAI records to solicit NAI's customers to follow her to GDR, the court below did not abuse its discretion by disregarding Hill's and GDR's "clean hands" defense. See *Ellis v. Photo America Corp.* (1983), 113 Ill. App. 3d 493; *Metcalf v. Altenritter* (1977), 53 Ill. App. 3d 904; *Illinois Power Co. v. Latham* (1973), 15 Ill. App. 3d 156.

Accordingly, we affirm in all respects the trial court's determination of liability and damages for Hill's breach of duty and for GDR's complicity therein.

NAI cross-appeals from the circuit court's grant of summary judgment to Hill on count I of her complaint, its denial of NAI's request for summary judgment on counts VII through VIII of its counterclaim, and its dismissal of counts VI through VIII. The court held that because some parts of the restrictive covenant contained within the employment agreement between Hill and NAI were unenforceable as being unreasonable restraints on Hill's ability to earn her livelihood, it would not permit NAI's invocation of the "severability" clause to allow enforcement of the only part of the covenant which NAI urged upon the court. The judge, however, did not determine whether that provision was enforceable.

Part (a) of the covenant prohibited Hill, while employed by NAI, from engaging in business activities which would distract her from her duties at, or which would compete with, NAI. NAI did not seek enforcement of this provision, so its validity was not decided upon by the circuit court. Part (b), which stated that it was an "essential element[]" of the employment agreement, prohibited Hill from competing with NAI for two years following the termination of her employment. While NAI did not seek enforcement of this provision, Hill sought to have it stricken, and the court held it to be unenforceable. Part (c), which also stated that it was an "essential element[ ]" of the agreement, had four parts. Part (c)(1) prohibited Hill from disclosing information about NAI's customers or from encouraging any NAI customer to leave NAI, for two years following termination of her employment. Enforcement of this provision was not sought by NAI, and thus the circuit court did not determine its validity. Part (c)(2) prohibited Hill from competing with NAI for, or soliciting the business of, any customer served by NAI "during the term of [her] employment," for two years following the termination of her employment. NAI sought enforcement of this provision only, but its validity was not adjudicated by the trial court. Parts (c)(3) and (c)(4) prohibited Hill from disclosing information learned by virtue of her position with NAI for two years following termination of her employment. While NAI did

not seek enforcement of these provisions, Hill challenged them, and the court held them to be invalid. Finally, part (d) prohibited Hill from soliciting or otherwise encouraging any NAI employee from leaving NAI. NAI did not seek enforcement of this provision; therefore, the circuit court did not adjudicate its validity.

The parties have spent considerable time and effort addressing a host of questions they have raised regarding this issue, but in light of our disposition thereof, none of those questions is pertinent to this appeal; we shall therefore limit our discussion accordingly. NAI does not dispute the trial court's determination that parts (b), (c)(3) and (c)(4) of the noncompetition covenant were "clearly unenforceable under Illinois law"; nor does it dispute that the covenant is unenforceable when read as a whole. Rather, it contends that the court should have given effect to the severability clause, thus eliminating the unenforceable provisions from the remainder of the covenant, and enforced only part (c)(2), the activity part of the covenant.

Hill maintains in response that in view of the fact that public policy does not favor covenants not to compete, and because such agreements are invariably contracts of adhesion, our courts should consider them as a whole, and not as an accumulation of separate agreements, some of which can be truncated from the agreement if unenforceable, while others are given effect. Hill further avers that because certain portions of the covenant in this case were invalid, the circuit court was correct in its determination that the entire covenant was incapable of enforcement regardless of the terms of the severability clause.

■■■ NAI maintains vigorously that "although general contract law opposes blue-pencilling, that same law favors severability," and that "no basis exists for differentiating employment covenants from other public policy contracts," citing, among others, English common law cases dating back to the year 1614. An examination of the employment agreement, however, exposes a conflict therein which leads irresistibly to the conclusion that the trial court's disposition of this issue should be affirmed without reaching the broad general question of whether or when invalid portions of restrictive covenants in such agreements may be severed so as to allow enforcement of valid portions, for this is hardly a case which lends itself to such an analysis. "[A] reviewing court may consider the entire record and should affirm if any basis exists therein for so doing." *Northern Trust Co. v. Winston* (1975), 32 Ill. App. 3d 199, 208.

■■■ As the trial judge held, there is no genuine issue of material fact relating to the interpretation of the agreement; its meaning is therefore a question of law which may properly be decided by this

court. (*McDonald's Corp. v. Butler Co.* (1987), 158 Ill. App. 3d 902, 908.) Parts (b), (c)(3) and (c)(4) of the covenant, which were invalidated by the trial court, were by their own terms "essential elements" of the agreement, although the judge, in his ruling, made no reference to their "essentiality"; nor did any of the parties allude in any way or for any purpose to those clauses. The term "essential elements," moreover, finds residence nowhere in the entire agreement save in parts (b) and (c) of the covenant not to compete and is made applicable only to those specific provisions in their entirety, which include, of course, (c)(2). The severability clause, however, allows severance of any invalid "portion or portions of this Agreement *** without affecting the validity of the remaining portions."

■■ ■ "Where one intention is expressed in one clause of an instrument and a different, conflicting intention appears in another clause of the same instrument, full effect should be given to the clause which is the more principal and specific, and the general clause should be subjected to such modification or qualification as the specific clause makes necessary." (*McDonald's Corp.*, 158 Ill. App. 3d at 909.) Thus, the clear and unmistakable specific provisions, which plainly exalt the invalid provisions of the restrictive covenant as "essential" to the agreement, necessarily overcome the general and all-encompassing severability clause and prevent the severance of parts (b), (c)(3) and (c)(4) as urged by NAI in order to allow enforcement of part (c)(2).

It might be contended, then, that our having found certain essential elements of the contract to be invalid, the entire employment agreement, *ipso facto*, should not be given legal effect, thus affecting other contractual issues treated above. (*Corti v. Fleisher* (1981), 93 Ill. App. 3d 517, 533-34.) However, neither party has sought to invalidate the entire instrument; in fact, both parties rely on the contract in seeking to enforce their respective claims. More important, although we may affirm on any grounds supported by the record, whatever reasons may have been asserted by the trial court for its holding, that venerable rule does not obtain in the case of a reversal. Accordingly, we affirm the trial court's grant of summary judgment to Hill on count I of her complaint, its denial of summary judgment to NAI on counts VII through VIII of its counterclaim and its dismissal of counts VI through VIII of that counterclaim.

NAI also cross-appeals from the trial court's denial of relief predicated upon Hill and GDR's alleged violations of section 2 of the Consumer Fraud Act (Ill. Rev. Stat. 1985, ch. 121½, par. 262), contending that the court erred in holding that Hill and GDR were not liable

under that Act. NAI bases its claim of Hill's and GDR's liability on Hill's writing of a letter to NAI customers implying that she was leaving NAI's employ because of problems within the company, and on Hill's deception of Mary Stewart in telling her that she would not reveal confidential Banner account information to anyone else and that she would return all such information to Banner if she ever left NAI's employ.

"[L]iability under the Consumer Fraud Act [is limited] to conduct that implicates consumer protection concerns." (*Jays Foods v. Frito-Lay, Inc.* (N.D. Ill. 1987), 664 F. Supp. 364, 368.) "[C]onsumer injury *** can take two forms *** directly or indirectly by affecting competition." (664 F. Supp. at 370. See also *Century Universal Enterprises, Inc. v. Triana Development Corp.* (1987), 158 Ill. App. 3d 182, 199.) In the instant case, while there was evidence that Hill's deceptions helped bring about decisions by the affected six customers to switch their business from NAI to GDR, the trial court found that Hill's misappropriation of NAI records and her subsequent mailing of those records to the various customers, as well as her use of Banner account information stolen from NAI offices in order to service Banner, was much of the cause of the defection of those customers. Hence, it is not clear that any misrepresentations by Hill, standing alone, would have affected the competition between NAI and GDR, or that they caused confusion to NAI customers that would have influenced "the market generally or otherwise implicate[d] consumer protection concerns." *Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc.* (N.D. Ill. 1987), 657 F. Supp. 1486, 1493 (defendant manufacturer misrepresented to consumers that its product was patented and approved by the United States Food and Drug Administration).

Thus, NAI failed to present sufficient evidence to mandate a conclusion that Hill's and GDR's actions toward NAI customers, rather than toward NAI itself, caused consumer confusion, mistake or unwarranted interference in the market so as to unfairly reduce the level of competition to the detriment of consumers. (*McDonald's Corp. v. Gunvill* (N.D. Ill. 1977), 441 F. Supp. 71, 75 (use by rival hamburger maker of a sign and slogan similar to that of plaintiff sufficient to state a cause of action for confusing consumers).) To the extent that Hill's and GDR's actions were directed toward NAI, the Consumer Fraud Act does not provide relief. (*Jays Foods*, 664 F. Supp. at 370 (no cause of action when alleged conduct is directed to retailers rather than consumers, even if the conduct affected consumer purchasing decisions).) We therefore affirm the trial court's

holding that Hill and GDR were not liable for any violations of the Act.

For all of the foregoing reasons, all of the orders of the circuit court entered herein are affirmed.

Affirmed.

HARTMAN and DiVITO, JJ., concur.