KENNETH W. LEVY, Plaintiff-Appellee and Cross-Appellant, v. MARKAL SALES CORPORATION *et al.*, Defendants-Appellants and Cross-Appellees.

First District (6th Division)    No. 1—92—3021

Opinion filed September 16, 1994.—Rehearing denied December 21, 1994.

William R. Quinlan, Michael K. Bartosz, and Michael I. Rothstein, all of Pope & John, Ltd., of Chicago, for appellants.

Gary P. Hollander, of Bixby, Lechner & Potratz, P.C., and Lewis W. Schlifkin, both of Chicago, for appellee.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

Kenneth Levy, the plaintiff, sued several defendants, including Victor Gust, Jr., and Robert Bakal. After a lengthy bench trial, the trial judge found that Gust and Bakal had breached their fiduciary duties to Levy and to the corporations in which all three men owned stock. The judge awarded Levy $3 million in punitive damages and approximately $2 million in compensatory damages. Gust and Bakal raise many issues on appeal, including contentions that most of the trial judge's determinations are against the manifest weight of the evidence and that the judge erred as a matter of law when awarding damages.

The parties dispute virtually every relevant fact in this case. The voluminous record on appeal provided by the defendants in support of their assertions that the trial judge made incorrect findings of fact includes eight volumes of common law record, three boxes of unbound, randomly ordered trial exhibits, and several boxes of non-consecutively paginated reports of proceedings. The reports of proceedings, memorializing a trial that spanned 14 months, are bound by date and time only, with a different binder for each morning and afternoon court session. The facts as recited in the parties' briefs are often in conflict; consequently, we have been required to examine the record. Because of the great disagreement between the parties, we will extensively recite the facts as we have independently found them.

Levy testified that he and two partners founded Markal in 1960 to serve as a sales representative for electronics manufacturers. Markal represented CB radio manufacturers, consumer electronic component manufacturers and audio equipment manufacturers, including Pioneer Corporation and Sony Corporation. Levy owned 40% of the Markal stock and served as a Markal officer and director. Markal hired Gust and Bakal as salespeople, and they were later promoted to corporate officer positions. Eventually, both Gust and Bakal became directors of Markal and purchased Markal stock. Gust owned 40% and Bakal owned 20% of the Markal stock.

In 1977, over Levy's objection, Gust, Bakal and Levy divided their Markal responsibilities by product type. Levy was placed in charge of the CB and parts businesses, which soon dwindled when the CB radio became less popular. Levy also remained in charge of all Markal administrative matters. Gust became solely responsible for Pioneer, a client procured by Levy, which became a large portion of Markal's business. Bakal testified that in 1977, Gust told both Bakal and Levy that he wanted to take the Pioneer business and start his own company, without Levy and Bakal. Bakal also testified

that Gust's son Tom, who was employed as a salesperson at Markal, complained to Gust that he could not obtain a higher position as long as he worked at Markal. A monetary settlement for dissolution of Markal was discussed, but Gust, Bakal and Levy remained in business together.

After dividing responsibilities at Markal, Gust, Bakal and Levy executed a stock repurchase agreement providing for the valuation and sale of any shareholder's stock. Levy placed this agreement into evidence, and the trial judge used the agreement to determine a value for the Markal stock.

On August 1, 1980, without Levy's knowledge, Gust and Bakal entered into an agreement with Markal. Gust, as president, signed on behalf of Markal Corporation; he also signed for himself individually. The agreement gave Bakal a written employment contract with Markal until 1985 and explained: "It is understood that you [Bakal] will devote substantially all of your time, attention and energies to the business of [Markal]." Gust also explicitly agreed "to remain as a full-time employee of [Markal] during the term of [Bakal's] employment" and to "not retire or otherwise reduce the scope of his employment with [Markal]." Gust promised that, if Bakal offered his stock for sale to Markal and Markal did not exercise its option to buy the stock, Gust would purchase the stock.

At the November 12, 1980, shareholders' meeting, the shareholders reelected Levy as a director of Markal. At the directors' meeting following the shareholders' meeting, Gust and Bakal voted to terminate Levy's employment with Markal. Gust and Bakal told Levy to remove his personal belongings from the office and excluded him from participation in the daily activities of Markal. After making several requests to Gust and Bakal to reconsider, Levy formally resigned from Markal on December 4, 1980. Gust and Bakal did not advise Levy of their August 1, 1980, agreement until after they fired him from Markal. Gust admitted that he did not tell Levy about this agreement because he did not want to "tip him off" to Gust and Bakal's plans. Levy was 58 years old when he was fired.

After Levy was fired from Markal, Markal became interested in representing computer hardware manufacturers. Bakal testified that "Markal was interested in investigating the opportunities" of a computer sales business and admitted that Markal wanted to become a manufacturer's representative for computer companies.

Gust was contacted by Mark Folley, a regional sales manager for Apple Computers, in 1981. Folley was responsible for procuring sales representatives for Apple in the Midwest. Gust testified that he and Bakal began negotiating with Folley. Bakal testified that he and

Gust decided not to offer the Apple opportunity to Markal because Folley told them Apple would not permit its products to be marketed by Markal.

Folley testified that he told Bakal and Gust "that they had to set up a separate and distinct corporation from the existing Markal Sales." Folley's supervisor, Lawrence Pape, also testified that he told Gust and Bakal that he "wanted a completely separate company to focus on Apple." Gene Carter, Apple's vice-president for sales, testified in his evidence deposition that Folley had the authority to require a separate entity and that Apple representatives were "not allowed to sell other [stereo] lines." Gust and Bakal did not offer Markal the chance to represent Apple, but established G/B Marketing for the express purpose of serving as an Apple representative. When G/B was formed on July 29, 1981, its sole officers, directors, and shareholders were Gust and Bakal. G/B began actively working as an Apple representative on October 1, 1981.

On cross-examination Folley admitted that he did not inquire about the stockholders of G/B because he "didn't deem it necessary." Folley also admitted that he chose G/B "based in part on the stability of Markal." Similarly, Pape did not ask who owned the stock in G/B because he "didn't think it was pertinent." Carter also admitted that he "didn't care" whether the representative's existing salespeople had sold consumer electronics in the past as long as they focused on computers once they contracted with Apple; he also "didn't expect them to give up their line [of other products], but did expect them to set up a separate entity."

Levy introduced several memos written by Folley. One memo is a handwritten list of what Folley testified were possible representatives for Apple. This list includes the names "Markal" and "Markal (MI)" with "G/B" written in the margin beside Markal. Also, in September 1981, Folley wrote a memo to Pape on the subject "G/B Marketing (Markal Sales)," which recommended that Apple employ "this firm." In the memo, Folley explained:

"I have checked their references and find that all who are or have been associated with Markal Sales have high praise for the organization, Additionally, my personal contacts with the account have all been positive. I feel that they will do whatever is necessary to sell to and serve the trade."

According to the evidence deposition of David Bowman, an Apple national sales manager, the regional managers were supposed to find sales representatives who had previously sold computers and who would sell only computers. But due to the rapid expansion of the computer industry, in several locations consumer electronics firms

such as Markal were Apple's best alternative. Bowman testified that at least five sales representatives hired by Apple had previous experience in the consumer electronics field, no experience in the computer field and retained their consumer electronics lines in addition to Apple. Levy and the Apple employees who testified agreed, based in part on a trade organization manual introduced into evidence, that the firm Apple chose to represent it in Minneapolis was a consumer electronics firm which jointly represented both Apple and Pioneer.

In defense of their assertion that the Apple opportunity was not available to Markal, Bakal and Gust presented testimony by Pioneer and Sony. James McManus, a regional sales manager for Pioneer, testified that he was upset when Gust informed him that "there was a possibility of [Markal] acquiring Apple computers." McManus told Gust that, if Markal chose to represent Apple, he would recommend that Markal be terminated as the Pioneer representative. Similarly, Robert Elman, a sales manger at Sony, testified that he was unhappy when Bakal told him Markal might add Apple as a client. Bakal asked Elman if he would be satisfied if Gust and Bakal formed a separate company to represent Apple, and Elman explained that a separate company with a separate sales staff would be acceptable.

Both Gust and Bakal testified that they were not involved in the daily operations of G/B and that two former Markal salespeople, Tom Gust and Bill Rychel, actually did the majority of the G/B work. Tom Gust is the son of the defendant Victor Gust. Gust and Bakal testified that they devoted the majority of their time and effort to Markal. Gust, Bakal, and Tom claimed that Tom Gust and Rychel signed many agreements on behalf of G/B and wrote most G/B correspondence. However, Tom Gust testified that he could not produce any documents supporting these claims.

The plaintiff presented extensive testimony and exhibits showing that Gust and Bakal were actively engaged in G/B business and ceased to give their full-time efforts to Markal once G/B was formed. The evidence that best supports the plaintiff's position consists of two document groups. First, on the 1981 and 1982 Federal income tax forms for G/B, Gust and Bakal each stated that they devoted "ALL" of their time to G/B in the box for "percentage of time devoted to business." Second, when Gust and Bakal formed a corporation named Micro to handle Apple sales in Michigan, Bakal signed an employment contract with Micro promising to devote "substantial time, attention and energies to [Micro]." Also, Gust testified that Bakal was responsible for running Micro. Micro ceased operations in September 1982.

Several documents prepared by Gust and by others at G/B

showed that Tom Gust and Rychel, while having G/B officer titles, were actually serving only as salespeople for G/B while Gust oversaw operations. Further, according to memos written by Gust and G/B, and expense reports submitted by Bakal, Bakal was given a sales quota and was the salesperson for G/B who served its two largest clients, in addition to several other clients. Gust wrote many memos as the administrative head of G/B, explaining and implementing policies. According to their Federal income tax records, both Gust and Bakal received $3,500-per-year automobile allowances for the use of their cars on G/B business. Folley, Pape and Bowman all testified that Gust and Bakal attended out-of-State training seminars for Apple in addition to local training sessions and spent time corresponding with and acting on behalf of Apple. Bowman testified that Gust and Bakal "met the requirements of [devoting] better than 60 percent" of their time to Apple, although Carter testified that there were no time requirements for Apple representatives.

Moreover, according to several witnesses and to documents obtained in discovery, Gust and Bakal performed many activities on behalf of G/B while they were Markal employees, including: attending several week-long meetings that involved travel outside the United States; negotiating a loan, an insurance policy and a lease for G/B; negotiating the agreement with Apple to service northern Illinois and southern Wisconsin and continuing their negotiations for the downtown Chicago sales area; interviewing and hiring a large G/B sales staff; signing every one of the thousands of checks G/B issued from 1981 until 1984; meeting with and writing to Apple employees in California and frequently corresponding with Folley; setting and monitoring the sales quotas of G/B employees; accepting and monitoring clients; holding and attending monthly G/B sales meetings; and entertaining potential and existing G/B customers.

Additionally, there was extensive evidence showing that Markal assets were used to benefit G/B and Micro. Several G/B salespeople remained on the Markal payroll while they worked for G/B or charged expenses to Markal while they worked for G/B. For example, Gust testified that he and Bakal did not go onto the G/B payroll until January 31, 1982, despite the fact that they worked for G/B beginning with its formation in July 1981. Tom Gust visited computer dealers with Bakal in 1981, while Tom Gust was a Markal salesperson. He and Bakal billed their expenses from these visits to Markal. A Micro employee, James Mallekoote, received Micro paychecks from March until September 1982, but also filed expense reports with Markal charging Markal for his Micro expenses. Gust's secretary, Mary Naselli, was paid by Markal but testified that she

typed most of Gust's G/B correspondence and answered all of Gust's G/B phone calls on the G/B phone lines at her desk. Markal's office manager, Sheldon Pestine, was never on the G/B payroll but handled some correspondence for G/B and responded to G/B employee requests regarding office issues such as keys. Gust admitted that Tom Gust and another Markal employee, George Kriza, were interviewed by G/B and trained to be Apple representatives while on the Markal payroll. Similarly, the Markal sales manager, Dave Hallett, attended an Apple training session and interviewed with Folley while on the Markal payroll.

To supplement the testimony about G/B employees being paid by or receiving support from Markal, Levy presented evidence showing that the Markal and G/B sales forces were never truly separate. For example, G/B's cash receipts journal lists the payment of many commissions to G/B by Markal. According to Bakal, this indicates that G/B employees were working for Markal and receiving commissions from Markal clients. This journal contains several deleted entries and whited-out entries, which Bakal admitted probably noted commission payments by Markal to G/B and rent payments from G/B to Markal. Additionally, Gust testified that the G/B and Micro employees were part of Markal's pension plan, and Bakal explained that G/B employees were part of Markal's employee insurance plan.

Levy also presented evidence that G/B underpaid rent to Markal. G/B was located in the same office space as Markal, as was Micro during its short existence. Bakal testified that G/B and Markal shared many common areas in the offices, including a large conference room, a library, storage areas and a lunch room. At one point, Gust testified that G/B used only 233 square feet of the 8,500-square-foot office space. Earlier in the trial, however, he explained that G/B generally occupied the lower half of the space while Markal occupied the upper half. G/B's insurance agent testified that G/B paid the premiums on an insurance policy covering 3,750 square feet in the office, and Levy introduced G/B's December 1981 policy stating that it occupied 3,750 square feet.

Gust testified that Markal's cost for the office space rent and other building expenses was between $3,700 and $4,000 each month. Beginning in August 1981, G/B paid Markal $100 monthly rent; Gust set this rent amount. The rent amount increased later, with G/B eventually paying approximately one third of the office space cost. At Gust's deposition, he explained that he did not know the basis for the $100 rent amount, but in the trial he stated that G/B paid its proportionate share based on space used. In part, his

testimony that only 233 square feet were used by G/B included the assertion that only 5% of his time, and thus only 5% of his large office, was used for G/B business. Bakal testified that what appeared to be many months of $100 rent payments to Markal had been whited-out of the G/B cash receipts journal.

After G/B began full operation, Markal of Michigan went out of business. Gust admitted that Markal of Michigan had accounted for 20% of Markal's revenues. Further, according to Gust, Markal was unable to completely meet its payroll and pay automobile allowances after G/B began operating and lost a great deal of revenue in Illinois.

At the conclusion of the testimony, the trial judge entered a lengthy written order. She found that Levy was legally fired, although she stated that "the termination was lacking in good faith, [and was] underhanded, deceitful and sly." She found that Gust and Bakal used Markal corporate assets, including their time and Markal office space, to further G/B, thus estopping them from arguing that Markal could not take the Apple opportunity. She also determined that, as fiduciaries, Gust and Bakal were required to offer the opportunity to Markal because she found that computers were reasonably incident to Markal's possible future business. She awarded Levy, as a stockholder and individually, 40% of the G/B expenses wrongly charged to Markal including the rent underpayment and the time Markal employees were paid when working for G/B, the value of his stock, the salary and pension funds paid by Markal to Gust and Bakal while they were breaching their fiduciary duties, and punitive damages. She denied the defendants' counterclaim which alleged that Levy had breached his fiduciary obligation to the corporation.

The defendants appeal the trial judge's findings that they violated their fiduciary duties and her imposition of compensatory and punitive damages. Levy has filed a cross-appeal. We granted the parties' joint motion to dismiss G/B Marketing from the appeal, leaving Bakal, Gust, and Markal as defendants-appellants. Gust and Bakal argue that the judge incorrectly applied the law and made factual determinations "against the overwhelming weight of the evidence" when she found that they breached their fiduciary duties. They recognize that we may not assess the credibility of witnesses and will reverse the trial judge's factual determinations only if they are "clearly against the manifest weight of the evidence." *Graham v. Mimms* (1982), 111 Ill. App. 3d 751, 767, 444 N.E.2d 549, 560.

As Levy notes, "[i]t is undisputed that the individuals who control corporations owe a fiduciary duty to their corporation and its shareholders." (*Graham*, 111 Ill. App. 3d at 761; see also *Kerrigan v.*

*Unity Savings Association* (1974), 58 Ill. 2d 20, 27, 317 N.E.2d 39; *Shlensky v. South Parkway Building Corp.* (1960), 19 Ill. 2d 268, 278, 166 N.E.2d 793.) Gust, Bakal, and Levy's "mutual obligations were similar to those of partners" and they had a fiduciary duty "to deal openly and honestly" with each other (*Illinois Rockford Corp. v. Kulp* (1968), 41 Ill. 2d 215, 222, 242 N.E.2d 228), and to "exercise the utmost good faith and honesty in all dealings and transactions" relating to each other and to Markal. *Couri v. Couri* (1983), 95 Ill. 2d 91, 98, 447 N.E.2d 334.

Gust and Bakal, as fiduciaries, could not place themselves "in a position where their own individual interests might interfere with the performance of their duties to their corporation" and could not use their positions for their own personal gain. (*Kerrigan*, 58 Ill. 2d at 30; see also *Shlensky*, 19 Ill. 2d at 278.) Also, they were governed by "the corporate opportunity doctrine[, which] prohibits a corporation's fiduciary from taking advantage of business opportunities which are considered as 'belonging' to the corporation." (*Graham*, 111 Ill. App. 3d at 762.) Gust and Bakal, as the directors and fiduciaries of Markal, "have the burden of establishing the fairness and propriety of the[ir] transactions." *Shlensky*, 19 Ill. 2d at 283; see also *In re Estate of Kieras* (1988), 167 Ill. App. 3d 275, 280, 521 N.E.2d 263.

■ Levy argues that Gust and Bakal did not carry their burden of proving that they did not usurp the Apple corporate opportunity from Markal. We hold that Gust and Bakal breached their fiduciary duties to Markal and Levy because they failed to offer the Apple opportunity to Markal and because they used Markal assets for the benefit of G/B and Micro. Levy also maintains that Gust and Bakal are barred from arguing that the Apple opportunity did not "belong" to Markal because Gust and Bakal violated discovery rules. Gust and Bakal maintain that they fully complied with the discovery rules and that they "have produced all documents requested by Levy in good faith." We disagree with this assertion.

On July 3, 1986, Judge Roger Kiley ordered Gust to make a complete and good-faith attempt to answer questions in his discovery deposition. When Gust was first deposed, he claimed that he could not remember most aspects of G/B's negotiations and dealings with Apple. Judge Kiley noted, "Gust [has] for all practical purposes sa[id] I know nothing about nothing," and "Gust had demonstrated his complete unwillingness to disclose information concerning this case." He determined that Gust's actions were the "functional equivalent of refusing to go to a deposition" and ordered Gust to make a better effort to answer questions.

Further, in response to Levy's discovery request, Gust and Bakal claimed that they could not produce any correspondence between G/B and Apple. On June 1, 1989, Judge Reynolds imposed a sanction of attorney fees against Gust based on this "sabotage in discovery." The judge found that Gust was guilty of "destroying the records [of G/B] which wasn't normal for his [usual course of business]." Gust did not appeal this order.

In her decision, Judge Reynolds ruled that Gust and Bakal's failure to offer the opportunity to represent Apple to Markal before taking it for G/B was a breach of their fiduciary duties because the Apple business was reasonably incident to "Markal's prospective operations." She noted that it was "not disputed that in 1981 Markal was interested in entering the computer industry as a manufacturer's representative."

Gust and Bakal argue that Apple would not allow Markal to represent it. According to Gust and Bakal, a fiduciary must offer a corporate opportunity to his corporation only when the corporation can definitely take advantage of the opportunity. Levy asserts that, under Illinois law, a fiduciary must offer an opportunity to a corporation before taking it himself, even if he believes his corporation cannot take advantage of the opportunity.

The general rule is that, "when a corporation's fiduciary wants to take advantage of a business opportunity *which is in the corporation's line of business* \*\*\*, the fiduciary must first disclose and tender the opportunity to the corporation, *notwithstanding the fact that the fiduciary may have believed that the corporation was legally or financially incapable of taking advantage of the opportunity.*" (Emphasis added.) *Graham*, 111 Ill. App. 3d at 765.

Like the trial judge, the parties rely on *Kerrigan v. Unity Savings Association* (1974), 58 Ill. 2d 20, 317 N.E.2d 39. In *Kerrigan*, a bank shareholder brought a derivative suit alleging that other bank shareholders opened an insurance agency to take advantage of insurance business from bank customers without first offering that business to the bank. The defendants admitted that they did not offer the business to the bank, but argued that the banking code prohibited a bank from writing insurance. The *Kerrigan* court first held that the bank could have sold insurance and explained that it therefore did not have to address the duty of the defendants if the bank could not have written insurance. (*Kerrigan*, 58 Ill. 2d at 27.) However, the court then stated that the defendants' incorrect belief that the bank could not sell insurance "cannot operate as a substitute for defendants' duty to present the question to [the bank] for [the bank's] independent evaluation." (*Kerrigan*, 58 Ill. 2d at 28.) According to *Kerrigan*:

"For various *** reasons [the bank] might properly have concluded as a matter of business judgment that it did not want to become an insurance broker. But if the doctrine of business opportunity is to possess any vitality, the corporation or association must be given the opportunity to decide, upon full disclosure of the pertinent facts, whether it wishes to enter into a business that is reasonably incident to its present *or prospective* operations. If directors fail to make such a disclosure and to tender the opportunity, the prophylactic purpose of the rule imposing a fiduciary obligation requires that the directors be foreclosed from exploiting that opportunity on their own behalf." (Emphasis added.) *Kerrigan*, 58 Ill. 2d at 28.

In two later cases where the opportunities were also within the corporations' present or prospective lines of business, the supreme court repeated this *Kerrigan* language. First, in *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 305, 321 N.E.2d 1, the court quoted the *Kerrigan* language set forth above and explained that "the defense [in *Kerrigan*] was made that the [bank] *** lacked the legal power to engage in the [insurance] business ***. We rejected that defense for the reason that the [bank] had never been given the opportunity to decide that question for itself." (See also *Lindenhurst Drugs, Inc. v. Becker* (1987), 154 Ill. App. 3d 61, 68, 506 N.E.2d 645.) Similarly, in *Mullaney, Wells & Co. v. Savage* (1980), 78 Ill. 2d 534, 549, 402 N.E.2d 574, the court explicitly relied on *Kerrigan* and *Vendo* and held that "[i]t is not an answer to state *** that there is no evidence that the plaintiff [corporation] either 'contemplated' or 'would have desired to make' " use of the opportunity. According to *Mullaney*, "[t]hat is a decision to be made by the [corporation] upon disclosure of the pertinent facts." *Mullaney*, 78 Ill. 2d at 549.

Gust and Bakal cite only two cases to support their argument. One was decided before *Kerrigan*, *Northwestern Terra Cotta Corp. v. Wilson* (1966), 74 Ill. App. 2d 38, 219 N.E.2d 860, and the other relies solely on cases decided before 1968, *Peterson Welding Supply Co. v. Cryogas Products, Inc.* (1984), 126 Ill. App. 3d 759, 467 N.E.2d 1068. We find both cases inapplicable here, and we will apply the law of *Kerrigan* as explained in *Vendo* and *Mullaney*. Applying the language in *Kerrigan* stating that the fiduciary must only disclose opportunities "reasonably incident to [the corporation's] present or prospective operations," we must first determine whether Apple was reasonably incident to Markal's present or future business.

The trial judge was presented with conflicting testimony on this point and made credibility and factual determinations which we will not disturb. For example, although Folley and Pape testified that

they wanted a separate entity to sell Apple products, they also explained that the previous experience of the sales force was irrelevant as long as the Apple salespeople sold only Apple products. Bowman testified that at least five Apple representatives maintained their other electronics clients, and another representative chosen by Apple sold Apple and Pioneer products at the same time.

Moreover, there is no question that Markal was interested in entering the computer field in 1981, making the sale of computers part of its prospective business. The parties agree that the original negotiations with Apple were conducted by Gust and Bakal when they were solely employees of Markal. Folley admitted that he based his decision about G/B on his favorable research into Markal, and the memos he wrote indicate that Markal was, at least at one time, being considered as an Apple representative. Finally, while McManus' testimony about Pioneer's unhappiness with any Markal plans to represent Apple was not rebutted, Gust and Bakal took no steps to persuade Pioneer to change its position and did not even attempt to follow the course Bakal suggested to Sony by establishing a separate Markal-owned company to sell Apple products.

Faced with this testimony, the judge determined that the Apple opportunity was reasonably incident to a prospective business of Markal. A judge's findings of fact are "not against the manifest weight of the evidence merely because the record might support a contrary decision." (*Graham*, 111 Ill. App. 3d at 767.) The judge's decision is supported by testimony and documents introduced at trial and is not against the manifest weight of the evidence.

Therefore, Gust and Bakal could not take advantage of the Apple opportunity without first offering it to Markal and having Markal reject it. As noted in *Kerrigan*, perhaps Markal would have chosen not to risk any present clients on the possibility of future Apple earnings. Nonetheless, Markal, as an electronics dealer with an interest in computers, might have decided to create a separate entity to pursue this opportunity or might have persuaded Pioneer to remain a client like the other Apple representative was able to do. In any event, Markal should have been "given the opportunity to decide that question for itself." (*Vendo*, 58 Ill. 2d at 305.) The trial judge properly determined that Gust and Bakal breached their fiduciary duties to Markal by failing to give Markal that opportunity.

Even if we disagreed with this portion of the judge's decision, we would still affirm her findings because she also properly determined that Gust and Bakal breached their fiduciary duties to Markal because they used Markal assets to develop and support G/B, estopping them from arguing that the Apple opportunity was not available to Markal.

The judge found that many Markal assets were taken by Gust and Bakal and used to further the development of G/B. She determined that, under the August 1980 agreement, both Gust and Bakal owed a substantial portion of their professional time to Markal but had failed to comply with that duty by spending substantial time on G/B and Micro. She also found that G/B underpaid rent to Markal, charged expenses to Markal and used Markal employees. Relying on *Graham v. Mimms* (1982), 111 Ill. App. 3d 751, 767, 444 N.E.2d 549, the judge determined that Gust and Bakal's use of Markal assets to develop G/B estopped them from arguing that Markal could not use the Apple opportunity and thus established their liability for usurping a corporate opportunity.

It is well settled that a fiduciary's use of corporate assets to further his own goals is a violation of his fiduciary duties. (*Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 664, 344 N.E.2d 805.) A fiduciary may not use the corporation's assets without compensating the corporation and should not put himself in a position of conflict where he is tempted to use corporate assets for his own purposes. (See *Kerrigan*, 58 Ill. 2d at 29-30.) For example, he may not take the corporation's assets, including office space, to help another corporation in which he has an interest. *Cf. Shlensky*, 19 Ill. 2d at 286.

We agree with the trial judge that *Graham* is controlling here. In *Graham*, two shareholders sued the corporation's third shareholder, Mimms, because Mimms, while a director of the corporation, established a new company to take advantage of several business opportunities. Mimms developed these opportunities while he was working for the corporation, using corporation employees and his own time, and then fired the plaintiff shareholders from their director positions. Mimms also bought the corporation's furniture for his new company very inexpensively. On appeal from the trial judge's determination that he had usurped the opportunities, Mimms argued that the corporation was not able to take advantage of the opportunities.

The *Graham* court rejected this argument without analyzing the corporation's ability to use the opportunities. Instead, the court held that Mimms was estopped from making this assertion. According to *Graham*, "the 'core principle' of the corporate opportunity doctrine is that a corporation's fiduciary will not be permitted to usurp a business opportunity which was developed through the use of corporate assets." (*Graham*, 111 Ill. App. 3d at 763.) The court explained that an executive's time is one asset of a corporation and noted that Mimms used his own time as well as many other corporate assets to develop the opportunities. This use of corporate assets was "an implied assertion *** that the project constituted a corporate

opportunity." (*Graham*, 111 Ill. App. 3d at 764.) The court held: "[W]hen a corporation's fiduciary uses corporate assets to develop a business opportunity, the fiduciary is estopped from denying that the resulting opportunity belongs to the corporation whose assets were misappropriated ***." *Graham*, 111 Ill. App. 3d at 763.

■ Gust and Bakal do not contest the law as outlined in *Graham*. Instead, they argue that the judge's finding that they used Markal assets to develop G/B is "baseless." We disagree. The only evidence establishing that Gust and Bakal did not give a large amount of time to G/B came from their own testimony; the trial judge was free to disbelieve this testimony and to rely on the extensive evidence supporting Levy's position. For example, Gust and Bakal's tax returns for G/B indicate that they spent "ALL" of their professional time in 1981 and 1982 working for G/B, and Bowman stated that Gust and Bakal spent at least 60% of their time on Apple business. Additionally, even if Bakal and Gust had not broken their respective promises "to remain as a full-time [Markal] employee" and to devote "substantially all of [their] time, attention and energies to the business of [Markal]," the judge's decision would still be supported by evidence that Markal assets in addition to Gust and Bakal's time were used to benefit G/B. Gust admitted in his deposition that he did not know why G/B paid only $100 a month for rent; he admitted that G/B occupied half of the office space; he also insured half of the space on behalf of G/B. Similarly, Naselli's testimony and the expense reports from G/B and Markal employees showed that Markal paid several employees while they worked for G/B and paid many expenses for G/B personnel, including Bakal. As in *Graham*, the defendants here owed fiduciary duties to Markal, yet they used Markal assets for their own benefit and to develop the Apple opportunity. These acts estop them from arguing that Markal could not have represented Apple.

■ Gust and Bakal next assert that they were prejudiced by one of the judge's findings. The judge determined that certain deposition testimony given by Gust constituted a judicial admission that, after October 1, 1981, Gust and Bakal did not devote substantially all of their time to Markal. Despite this determination, the judge still allowed all parties to present testimony regarding Gust and Bakal's level of involvement with Markal after G/B was formed. Thus, the judge treated these alleged judicial admissions more like evidentiary admissions. (See generally *Young v. Pease* (1983), 114 Ill. App. 3d 120, 448 N.E.2d 586.) Accordingly, Gust and Bakal have not shown how this ruling harmed them. This is especially true where it is clear from other evidence that the judge's decision about Gust and Bakal's

failure to give substantial time to Markal was well supported. Therefore, we reject the contention of Gust and Bakal that the judge committed reversible error by indicating that Gust's deposition testimony was a judicial admission.

Levy and the defendants also contest the amount of damages the trial judge imposed for the breaches of fiduciary duties. The trial judge refused Levy's request for attorney fees, noting "this case is not a derivative action," but nonetheless awarded him his shareholder's percentage of Markal's damages in addition to the value of his stock. Gust and Bakal ask us to reverse the stock value award. According to Gust and Bakal, this case is solely a derivative action, precluding Levy from receiving any damages on an individual basis. To support this argument, Gust and Bakal rely on count I of Levy's four-count complaint, in which he alleged that he was acting "representatively and derivatively." They ignore the rest of the complaint, however, which includes multiple allegations that Levy was suing on his own behalf and had suffered individual harm.

In Illinois, a shareholder may bring a derivative action and an individual claim at the same time if he has suffered a different injury from his fellow shareholders. Thus, "where the wrongful acts are not only against the corporation but are also violations of a duty *** owed directly by the wrongdoer to the stockholders," a stockholder may sue both derivatively and individually to obtain redress for these wrongs. *Zokoych*, 36 Ill. App. 3d at 663.

Although the judge first stated that she was not considering this a derivative action, later in her order she awarded Levy, as a shareholder, his portion of the damages due to Markal. We will follow this approach, which is consistent with the complaint itself, and hold that this case is both an individual and derivative action. Thus, Levy could recover for the value of his stock if Gust and Bakal converted the stock and the value was ascertainable. Gust and Bakal do not contest the fact that their "freeze-out" of Levy operated as a conversion of his stock.

Instead, Gust and Bakal argue that the judge did not have a sufficient basis to assess the dollar value of Levy's stock at $499,999. The judge calculated this figure based on the share value established in the 1978 stock repurchase agreement. The stock repurchase agreement provides that, in the event of a shareholder's death, the corporation would purchase that shareholder's stock for an amount equal to its value. The agreement explains that "unless and until a new value is established as herein provided, the value of said stock shall be $4,578.75" per share. In 1982, Gust and Bakal agreed that the stock repurchase agreement still reflected the value of the stock.

A trial judge's assessment of damages "will not be set aside unless it is manifestly erroneous." (*Vendo*, 58 Ill. 2d at 311; see also *Zokoych*, 36 Ill. App. 3d at 675.) Gust and Bakal argue that it was manifestly erroneous for the judge to use the share value set in the agreement because it is mentioned for use in the event of a shareholder's death and because Levy "had the burden of proving with competent expert testimony the value of his shares."

Gust and Bakal first cite *Ashe v. Sunshine Broadcasting Corp.* (1980), 90 Ill. App. 3d 97, 412 N.E.2d 1142, which actually supports the plaintiff's position. The *Ashe* court noted, "[I]t is true, of course, that a party seeking damages must supply a reasonable basis for the computation of those damages." (90 Ill. App. 3d at 101.) The court explained, however, that "[w]hen dealing with the stock of a close corporation, which has no ascertainable market value, it becomes necessary to prove the value by the next best evidence [and] *** it is proper for a court to *** fix the value of the stock in some rational way from such elements as are ascertainable." (*Ashe*, 90 Ill. App. 3d at 101.) This rationale was echoed in the other case used by Gust and Bakal, *Taxy v. Worden* (1989), 181 Ill. App. 3d 97, 536 N.E.2d 901. *Taxy* involved a specific application of the Business Corporation Act, and thus is not directly applicable to this case. Nonetheless, the court stressed that a determination of the value of stock for a close corporation should be based in part on "an exercise of the court's judgment." *Taxy*, 181 Ill. App. 3d at 101.

■ Applying this law to the judge's determination here, we judge that her decision was a proper exercise of discretion and was not manifestly erroneous. She used a dollar amount which was agreed by the parties to be "the value of said stock," and which had been explicitly reaffirmed by Gust and Bakal several years after the original valuation. As recommended in *Ashe*, the trial judge used a rational way to set the value of the stock based on sufficient evidence of the worth of the shares.

■ Next, we agree with the judge's order requiring Gust and Bakal to forfeit all salary and other benefits they were paid by Markal during the time they were running G/B and thus breaching their fiduciary duty of loyalty to Markal. Gust and Bakal assert that the trial judge's award "is patently excessive" because "the evidence is uncontested that they continued to work diligently for Markal." Again, we will not retry this case by questioning the trial judge's factual findings that Gust and Bakal did not act faithfully toward Markal and will reverse this aspect of the damages award only if it is manifestly erroneous. *Vendo*, 58 Ill. 2d at 311; *Monotronics Corp. v. Baylor* (1982), 107 Ill. App. 3d 14, 17, 436 N.E.2d 1062.

Illinois law permits a complete forfeiture of any salary paid by a corporation to its fiduciary during a time when the fiduciary was breaching his duty to the corporation. In *Vendo*, the supreme court affirmed the judge's order requiring one defendant to forfeit all salary from the corporation for the three years and five months while he was usurping an opportunity that he never offered to the corporation. (*Vendo*, 58 Ill. 2d at 313.) In fact, the court found that "[i]t borders upon the frivolous for defendant[ ] to claim a right to retain the compensation" earned while breaching his duty of loyalty to the corporation, even though he did legitimate work for the plaintiff during his breach. *Vendo*, 58 Ill. 2d at 314.

The rationale for the complete forfeiture rule has been explained in several recent cases. In *Graham*, the court noted that "[w]hen a fiduciary breaches his duty of loyalty by misappropriating corporate assets, or by usurping corporate opportunities, restitution can be compelled by means of a constructive trust" through which the court orders the fiduciary to transfer the assets in question, such as salary and benefits, to the plaintiff. (*Graham*, 111 Ill. App. 3d at 762.) The court rejected the idea that this remedy is too harsh, explaining:

"[A]s a matter of public policy in the corporate context, courts have been 'inveterate and uncompromising' in applying the constructive trust remedy ***. [Citation.] This 'inveterate and uncompromising' application of the constructive trust remedy 'does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.' [Citation.]" *Graham*, 111 Ill. App. 3d at 762-63.

Similarly, in *Hill v. Names & Addresses, Inc.* (1991), 212 Ill. App. 3d 1065, 1083, 571 N.E.2d 1085, the court explained that public policy requires this forfeiture "even when it more than compensates the plaintiff for injury or damage resulting from a breach of loyalty." Like the *Graham* court, the *Hill* court noted the public policy rationale of removing any incentive for a fiduciary to betray his corporation and concluded, "the purpose of [this remedy] is not to compensate the injured party for his losses, but to deprive the wrongdoer of the gains resulting from a breach of duty." *Hill*, 212 Ill. App. 3d at 1086.

This rationale was applied in a case relied on by Levy and the trial judge, *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 413 N.E.2d 1299. According to the *ABC* court, "it has long been recognized" that a fi-

duciary employee is entitled to compensation only "on a due and faithful performance" of all his duties. (*ABC*, 90 Ill. App. 3d at 837.) The court followed the *Vendo* language regarding forfeiture of all salary beginning with the time of the initial breach, and noted that the fact the defendants continued to perform some of their duties for the plaintiff was irrelevant. The *ABC* court explained: "[I]t makes no difference whether the result of the agent's conduct is injurious to the principal or not, as the misconduct of the agent affects the contract from considerations of *public policy* rather than of injury to the principal." (Emphasis in original.) *ABC*, 90 Ill. App. 3d at 837.

Gust and Bakal cite several Federal cases, which are not controlling here, and *Monotronics Corp. v. Baylor* (1982), 107 Ill. App. 3d 14, 17, 436 N.E.2d 1062. In *Monotronics*, the trial judge found a breach of fiduciary duty but refused to award the plaintiffs the salary paid to the defendant during the breach. According to the appellate court, "the evidence adduced at trial tended to show that plaintiffs had acquiesced in [the defendant's] competitive activity." (*Monotronics*, 107 Ill. App. 3d at 19.) Further, the earnings and assets of the plaintiffs' corporation, as well as their salaries, actually increased greatly during the defendant's breach of fiduciary duties, "[d]ue primarily to his efforts." (*Monotronics*, 107 Ill. App. 3d at 19.) According to the *Monotronics* court, these factors distinguished *Vendo* and *ABC*, and showed that a total forfeiture "would produce an extremely harsh and unjust result in this case." (*Monotronics*, 107 Ill. App. 3d at 19.) Without expressing agreement or disagreement with *Monotronics*, we simply hold that the peculiar facts of *Monotronics* are distinguishable from the facts of this case. We do, however, have some doubt that the holding of *Monotronics* comports with the holdings of *Graham, Hill, ABC* and particularly *Vendo*.

Applying this public policy, we hold that the trial judge's order requiring Gust and Bakal to forfeit their entire salary and benefits was not manifestly erroneous. Therefore, we affirm the salary and benefits forfeiture of $1,699,118. Gust and Bakal do not argue that the judge incorrectly calculated the amount of the salary award.

As part of her determination that Gust and Bakal should forfeit all salary and compensation, the judge ordered forfeiture of what Levy calls "an amount equal to the increase in Gust and Bakal's pension funds during this time." In her order, the trial judge separately listed the type and amount of damages she was ordering. She listed one item as "salary forfeiture $1,387,496" and the next item as "pension fund forfeiture $311,622." Gust and Bakal claim that the imposition and amount of the pension award are manifestly erroneous.

Gust and Bakal correctly assert that any trial court attachment of their actual pension funds would violate ERISA. (29 U.S.C. § 1056(d)(1) (1980).) (See, *e.g.*, *Patterson v. Shumate* (1992), 504 U.S. ___, 119 L. Ed. 2d 519, 112 S. Ct. 2242.) Levy does not contest this law, but argues that the judge merely awarded an amount equal to what Gust and Bakal gained from Markal's contributions to their pensions during the period of their breach. Levy notes that the trial judge did not enter any specific attachment of the pension funds; she simply entered an order assessing money damages.

■ Gust and Bakal have the burden of proving their position on appeal and must overcome "the presumption that the trial court's judgment is correct." (*Thanopoulos v. Pickens* (1980), 87 Ill. App. 3d 906, 909, 409 N.E.2d 477; see also *Mitchell v. Toledo, Peoria, & Western R.R. Co.* (1972), 4 Ill. App. 3d 1, 3, 279 N.E.2d 782.) In this case, the trial judge noted each type of damage she was awarding and listed each type individually, possibly to explain how she arrived at the final damage figure. Nonetheless, she still ended her order with a combined statement of damages that did not require the money to be taken from any specific fund: "Plaintiff is awarded damages of $4,952,249." Although she labeled an item "pension fund forfeiture," one reasonable reading of this order is that she was not awarding money from a specific pension fund, but was awarding a dollar amount equal to what Gust and Bakal gained from Markal's contributions into the funds. Indulging in every reasonable presumption that the trial judge's order was proper, we hold that her designation was only an explanation and was not an improper attachment of pension funds under ERISA. Nonetheless, to avoid any future misconstruction, we hereby modify the order under Supreme Court Rule 366 (134 Ill. 2d R. 366) to provide only for a sum of money and not for attachment of any pension funds.

Gust and Bakal's second assignment of error regarding this item of damages involves the calculation. With no citation to the record or any other material (see 134 Ill. 2d R. 341(e)(7)), Gust and Bakal claim that the trial judge incorrectly calculated the amount paid into the funds by Markal and that only $37,471 was actually placed into their funds. There was no testimony at trial about Gust and Bakal's pension funds, but the plaintiff submitted exhibits showing the balance in the funds each year.

■ As Levy notes, no portion of the record supports Gust and Bakal's argument. Instead, the trial judge reasonably calculated the award based on the increase in the funds while Gust and Bakal were breaching their duties to Markal. While part of this increase probably came from interest paid on the entire fund, as Gust and Bakal

argue, they have the burden of proving what portion of the funds constitutes improperly acquired assets; "sorting out" which assets came from Markal is not the job of this court, the trial court or Levy. (*Graham*, 111 Ill. App. 3d at 767.) They have not carried their burden of showing us that the judge's decision was improper. Therefore, we affirm the award of $311,622 as an amount equal to what Gust and Bakal gained from Markal for their pensions while they were breaching their fiduciary duties.

■ Gust and Bakal additionally challenge the damages order by arguing that it holds Gust, Bakal and Markal jointly and severally liable for the damages. The order specifically limits the imposition of the punitive damages to Gust and Bakal, but is silent regarding liability for the compensatory damages. Although Gust and Bakal again cite no authority to support this argument, we believe it prudent to make the order clear in this regard, and we again modify the judge's order under Supreme Court Rule 366 to enter all damages solely against Gust and Bakal, and not against the corporation on whose behalf they were awarded.

The final compensatory damages issue is raised by Levy in his cross-appeal. After the judge determined the amount of all compensatory damages, she awarded 100% of those damages to Levy. Gust and Bakal argued that Levy should receive only 40% of the damages, based on his partial ownership of Markal. The judge agreed and reduced the entire compensatory award by 60%. Levy contends that awarding him only 40% of the damages is improper because he is the only innocent shareholder.

■ Levy is correct in his assertion that he should receive 100% of the value of his stock. The judge calculated the value of Levy's stock based on his 40% ownership to arrive at the award of $499,999.50. When she reduced the other compensatory damages to reflect the fact that Levy owned only 40% of Markal, she also reduced the amount awarded for his shares by 60%, thus giving him an award for substantially less than the value of his stock. As Levy explains, the judge obviously made a computational error on this point. Using Rule 366, we modify the order to award Levy the entire value of his 40% Markal interest, or $499,999.50.

However, we will not grant Levy the other relief he requests on this point. It is true that Gust and Bakal must forfeit all the salary they earned during their breach. This salary should be returned to the corporation, however, and not directly to Levy. Then, as a 40% owner of Markal, Levy can obtain 40% of what Gust and Bakal must pay Markal. (Cf. *Monotronics*, 107 Ill. App. 3d at 16 (defendant's obligation to corporation reduced by one-third in recognition of the

defendant's one-third ownership interest).) To allow Levy to take all of the damages suffered by Markal would give Levy a windfall. Despite the appeal of Levy's contention that the wrongdoers, Gust and Bakal, as 60% owners of Markal, will improperly be able to receive the other 60% of the damages from Markal if Levy does not receive 100% of the award, Levy cites no authority, and research reveals none, to support this proposition. Other than the value of Levy's stock, all compensatory damages awarded by the trial judge stem from injuries suffered by the corporation, and not by Levy personally. He therefore may recover only his proportionate share, 40%, of these damages that Gust and Bakal must pay Markal. Accordingly, we affirm the compensatory award of $53,131 for Markal assets used by G/B. Gust and Bakal do not contest the amount of compensatory damages entered for the time and expenses G/B employees charged to Markal or for the rent G/B underpaid Markal.

The final contention raised by Gust and Bakal is that the imposition of punitive damages in this case was improper. They claim that the award violates Federal constitutional law and Illinois common law. We reject both of these assertions.

Levy requested the imposition of $5 million in punitive damages. In her first order awarding damages, the trial judge stated:

> "[T]his is a proper case for the assessment of punitive damages. Punitive damages should be based on the nature of the wrong committed. In the present case, the court finds that the wrong committed is of such a nature as to warrant the award of punitive damages. Plaintiff is awarded $3,000,000.00 in punitive damages jointly and severally against Gust and Bakal."

In their motion requesting a reduction of the damages, Gust and Bakal argued that the imposition of punitive damages was improper because the judge did not explicitly find their conduct to be malicious and because they acted in reliance on the advice of their attorney. When she modified her damages award to reflect Levy's 40% interest in Markal, the judge again listed all the damages she was awarding and the new amount for each item. At the end of this list she wrote "Punitive damages $3,000,000.00." The total amended compensatory damage amount awarded to Levy was $1,952,249.48.

In their opening brief, Gust and Bakal argue that the recent United States Supreme Court opinion in *Pacific Mutual Life Insurance Co. v. Haslip* (1991), 499 U.S. 1, 113 L. Ed. 2d 1, 111 S. Ct. 1032, requires many new procedural safeguards before punitive damages may be imposed. In *Haslip*, the Court held that the imposition of punitive damages may implicate due process. We do not read *Haslip* as so far-reaching as Gust and Bakal do. The *Haslip* Court refused to

impose any particular standards or limits on the use of punitive damages. (See generally R.M. Richards, Note, *Pacific Mutual Life Insurance Co. v. Haslip: Punitive Damages and the Modern Meaning of Procedural Due Process*, 70 N.C. L. Rev. 1362 (1992).) In fact, in their reply brief Gust and Bakal concede that *"Haslip* does not mandate particular procedural safeguards." The *Haslip* Court said only that "general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus" regarding punitive damages. *Haslip*, 499 U.S. at 18, 113 L. Ed. 2d at 20, 111 S. Ct. at 1043.

Moreover, any language in *Haslip* tending to indicate that more safeguards would be required for punitive damage awards was rejected by the Supreme Court after the parties filed their initial briefs in this case. We granted the parties leave to file additional briefs discussing *TXO Production Corp. v. Alliance Resources Corp.* (1993), 509 U.S. 443, 125 L. Ed. 2d 366, 113 S. Ct. 2711. In *TXO*, the Supreme Court again affirmed a jury award of punitive damages, despite the shocking disparity between the $10 million punitive award and the $19,000 compensatory damage amount. (*TXO*, 509 U.S. at 465-66, 125 L. Ed. 2d at 384, 113 S. Ct. at 2724.) The *TXO* Court held that mathematical proportionality between punitive and compensatory awards is not required, and refused to adopt a test, other than reasonableness, for punitive damage constitutionality. Applying this test, the Court rejected the argument that the punitive damages order should be reversed because the trial judge did not articulate reasons when he denied the defendant's post-trial motion to reduce the award. *TXO*, 509 U.S. at 452-53, 125 L. Ed. 2d at 375-76, 113 S. Ct. at 2717-18.

In this case, the trial judge entered lengthy written findings of fact which noted the "underhanded, deceitful and sly" character of Gust and Bakal's actions. She explained that punitive damages were appropriate under the facts of the case and explicitly affirmed her damages award in response to a post-trial motion. Under the reasonableness standard used to measure due process in *TXO*, the trial judge's actions were not violative of Gust and Bakal's Federal due process rights.

Second, Gust and Bakal argue that the punitive damage award should be reversed because the judge did not comply with Illinois common law regarding the imposition and amount of punitive damages. "Whether to award punitive damages is an issue for the sound discretion of the trial court, and its decision will not be set aside absent an abuse of discretion." (*Obermaier v. Obermaier* (1984), 128 Ill. App. 3d 602, 610, 470 N.E.2d 1047; *Monotronics*, 107 Ill. App. 3d

at 21.) Similarly, a reviewing court may reverse the amount of punitive damages only where "it is apparent that the award is the result of passion, partiality, or corruption." *Deal v. Byford* (1989), 127 Ill. 2d 192, 204, 537 N.E.2d 267; see also *Lipke v. Celotex Corp.* (1987), 153 Ill. App. 3d 498, 507, 505 N.E.2d 1213.

We recognize that "punitive damages are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded." (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 188, 384 N.E.2d 353.) Nonetheless, the Illinois Supreme Court has stated that, "[w]hile deceit alone cannot support a punitive damage award, such damages may be allowed 'where the wrong involves some violation of duty springing from a relation of trust or confidence.' " (*Home Savings & Loan Association v. Schneider* (1985), 108 Ill. 2d 277, 284, 483 N.E.2d 1225.) Similarly, the court in *Obermaier* explained that "[p]unitive damages are appropriate to punish and deter conduct where defendant is guilty of *** an intentional breach of fiduciary duty." *Obermaier*, 128 Ill. App. 3d at 610.

This principle was applied in *Hill* (212 Ill. App. 3d at 1086), where one defendant took files and client information from her employer and used them to further her new position at the defendant company. The court noted that "the evidence was profusive that [the defendants] acted intentionally and without just cause, thus giving rise to liability for punitive damages." *Hill*, 212 Ill. App. 3d at 1086.

Similarly, the court in *Obermaier* upheld a trial judge's decision that punitive damages were proper based on a breach of fiduciary duty and fraudulent acts. In *Obermaier*, a majority shareholder negotiated a deal that allowed him to receive more for his shares from a buyer than the plaintiff shareholder received. (*Obermaier*, 128 Ill. App. 3d at 604-06.) The *Obermaier* court affirmed the imposition of punitive damages, stating: "There was no abuse of discretion [by the trial judge] here where the trial court found a flagrant breach of fiduciary responsibility and clear evidence of fraud." *Obermaier*, 128 Ill. App. 3d at 610.

We hold that the judge did not abuse her discretion when she entered the punitive damages award. Like the *Hill* and *Obermaier* defendants, Gust and Bakal engaged in secret agreements that were harmful to Levy and performed multiple acts showing that they intentionally breached their duties to Levy and Markal. They purposely kept the August agreement from Levy until they had fired him, and they intentionally depleted large amounts of Markal assets, such as office space and employee expenses, for the benefit of G/B, showing the "flagrant breach of fiduciary responsibility" mentioned in *Obermaier*. The trial judge explicitly stated that "the wrong

committed is of such a nature as to warrant the award of punitive damages." The record is replete with testimony and exhibits supporting the trial judge's implicit finding that Gust and Bakal acted intentionally because their acts were "lacking in good faith, underhanded, deceitful and sly." As the *Home Savings* court explained, this type of willful breach of a fiduciary duty supports a trial judge's decision to award punitive damages.

Gust and Bakal have pointed to no evidence showing that the amount of this award was motivated by passion, partiality, or corruption. Although Gust and Bakal at first argued that the award must be proportional to the compensatory damages, they have apparently deserted that position. As Levy notes, in Illinois "[t]here is no requirement that the amount of punitive damages imposed on a defendant bear any particular proportion to the size of the plaintiff's compensatory recovery." (*Deal*, 127 Ill. 2d at 204.) Thus, to the extent that Gust and Bakal raise a proportionality argument, we reject it.

Gust and Bakal next argue that the imposition of punitive damages in this case was improper because they relied on the advice of their corporate attorney, Roy Palmer, when they formed G/B. Palmer was Markal's attorney, but despite that fact represented Gust and Bakal for the first six years after Levy filed the complaint. Palmer filed an appearance on behalf of Gust and Bakal and Markal on October 26, 1982. On June 10, 1989, Palmer made a motion to withdraw as to all defendants on the ground that it was anticipated that he would be a witness. On July 10, 1989, he was permitted to testify over the objection of Levy as a witness for "the defendants." The attorney for Gust and Bakal told the judge that "[t]here's a claim for punitive damages" and that "Palmer would testify." Palmer testified on behalf of Gust and Bakal. Gust and Bakal contend that Palmer told them all of their planned actions regarding Levy and G/B were proper. The trial judge implicitly rejected this argument when she left the punitive damages figure at $3 million after reducing the compensatory damages.

Gust and Bakal cite *Kritzen v. Flender Corp.* (1992), 226 Ill. App. 3d 541, 589 N.E.2d 909. In *Kritzen*, the appellate court reversed a jury's punitive damages award. The court noted that the "plaintiffs did not plead any facts to support a finding of willful and wanton misconduct, and *** the evidence was not sufficient" to support the punitive damage award. (*Kritzen*, 226 Ill. App. 3d at 555.) After so holding, the court continued: "Further, much of the evidence was that the [defendant] had relied on advice of counsel." *Kritzen*, 226 Ill. App. 3d at 555.

We do not read *Kritzen* as broadly as Gust and Bakal do and also

believe that it is factually distinguishable from this case. The *Kritzen* court simply noted in *obiter dicta* that the fact the defendant relied on its attorney's advice reinforced the idea that the defendant did not act willfully. Further, punitive damages awards have been upheld in cases where the defendant relied in part on the advice of counsel. See *Zokoych*, 36 Ill. App. 3d at 662-63.

Moreover, in this case the evidence supports the judge's implicit determination that Gust and Bakal willfully ignored the advice Palmer gave them and that Palmer never advised them to breach their fiduciary duties or to "freeze-out" Levy. While Palmer did tell Gust and Bakal that they could legally fire Levy, he did not tell them to keep their new employment agreements a secret from Levy or to exclude Levy from all Markal operations. Palmer repeatedly told Gust and Bakal they had fiduciary duties to Levy and Markal and that they had "an obligation to give full information to Mr. Levy." He told Gust and Bakal that they "owed their primary loyalty to Markal" and that they could only create and invest in a company to represent Apple if "it did not detract from their responsibilities to Markal *** [because] they had to be true to their principal." Palmer told Gust and Bakal that G/B had to be developed entirely with "their own individual resources." Finally, Palmer advised them that if Markal assets were used to develop G/B, there was a possibility the Apple opportunity would be held to belong to Markal. We reject Gust and Bakal's assertions that Palmer advised them that everything they did was proper.

The final contention Gust and Bakal raise is that the punitive damages award should be reversed because the judge did not consider their ability to pay. Gust and Bakal introduced no evidence concerning their financial status at trial and did not raise this argument in their motion asking the judge to reduce or eliminate the damages awards. Further, earlier in the appellate proceedings in this case, which involved many motions in this court and in the Illinois Supreme Court, Gust and Bakal aggressively argued that they should not have to post a full bond and contended that the lack of a full bond would not prejudice Levy's rights. Now, for the first time, Gust and Bakal assert without citation to any testimony or exhibits that "[t]he total judgment is more than Gust and Bakal can pay." Accordingly, we disregard and disapprove of Gust and Bakal's completely unsupported contention that, "[c]ontrary to the assertions [of Levy], defendants have consistently argued that the $3 Million punitive award *** exceeds defendants' ability to pay." We also disapprove of the practice, followed by all parties on appeal, of attaching many items to their later briefs, which are not part of the

record, purporting to show Gust and Bakal's assets. We will not consider these materials, which are outside the record. See 134 Ill. 2d R. 341.

Additionally, we will not address the question of Gust and Bakal's ability to pay, because they have waived this issue by not raising it in the trial court. Gust and Bakal had the burden of introducing evidence of their financial condition. Their failure to introduce any evidence precludes them from raising the issue here. As the supreme court recently explained:

> "Evidence regarding the financial status of a defendant is simply one relevant consideration to be weighed by the judge or jury in determining an appropriate award of punitive damages. The plaintiff was not required to present such evidence, and the defendants made no attempt to do so. The defendants cannot now complain of its absence." *Deal*, 127 Ill. 2d at 204-05.

Finally, Levy argues in his cross-appeal that the judge abused her discretion by denying his request for attorney fees. The "common-fund doctrine" allows a trial judge to award a prevailing shareholder his fees for a derivative action, but this decision is "in the discretion of the court." (*De Fontaine v. Passalino* (1991), 222 Ill. App. 3d 1018, 1034-38, 584 N.E.2d 933.) Levy has not shown that the judge's decision not to award his fees from the damages Gust and Bakal must pay Markal was an abuse of discretion.

In summary, we affirm the judge's decisions with modifications. The trial judge properly decided that Gust and Bakal breached their fiduciary duties to Levy and Markal and converted his stock. We modify the order to give Levy 100% of the value of his stock, or $499,999, and 40% of the other compensatory damages, or $53,131. We affirm the complete salary and benefits forfeiture of $1,699,118, but modify the order to award only a sum of money without reference to its source. Additionally, we modify the judge's order to award damages in favor of Levy and Markal and against Gust, Bakal and G/B only. Finally, we affirm the imposition of punitive damages in the sum of $3,000,000. Levy is therefore granted a total award of $5,252,248.

The decision of the circuit court is affirmed as modified.

Affirmed as modified.

RAKOWSKI and GIANNIS, JJ., concur.